Matter of A.M. (A.R.) (2025 NY Slip Op 50394(U))

[*1]

Matter of A.M. (A.R.)

2025 NY Slip Op 50394(U)

Decided on March 19, 2025

Family Court, New York County

Wilkofsky, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 19, 2025
Family Court, New York County

In the Matter of A.M., M.R, 
 Children Under Eighteen years of Age Alleged to be Abused and Neglected by A.R., Respondent.

Docket No. NA-xxxxx-24

Special Assistant Corporation Counsel Adriene Eisen, for the NYC Administration for Children's Services
Varun Bhadha, Neighborhood Defender Service of Harlem, attorney for the respondent
Marianna Allegro, The Legal Aid Society, attorney for the subject children
Daniel Kratka, attorney for the non-respondent mother

Yael Wilkofsky, J.

On February 2, 2024, the petitioner Administration for Children's Services ("ACS") filed Family Court Act ("FCA") article 10 abuse and neglect petitions against the respondent A.R. (the "respondent" or "A.R.") on behalf of the subject children A.M. and M.R. (the "subject children" or "A.M." and "M.R."). The petitions allege that the respondent is the father of M.R., is a person legally responsible for A.M., that the respondent abused A.M. in that he committed a sexual offense against her as defined in Penal Law article 130 and that based on such conduct, M.R. is derivatively abused. The petitions also allege that the respondent neglected the subject children in that he failed to provide them with proper supervision or guardianship by allowing to be inflicted harm or a substantial risk thereof based on the allegations of sexual abuse of A.M. and that M.R. is derivatively neglected. After a fact-finding hearing, for the reasons set forth below, the Court finds that the respondent abused and neglected the subject children.
The petitions allege as follows. The respondent is the father of M.R. and a person legally [*2]responsible for A.M. under the FCA in that the respondent and the non-respondent mother are legally married, the respondent provides financial assistance to the family and, prior to the incidents that led to the filing of the petitions, A.M. referred to the respondent as "dad." The respondent abused A.M. in that he committed a sexual offense against her pursuant to Penal Law §§ 130.05, 130.52, 130.55 and 130.60 in that in or around March 2022, the respondent stood over A.M. while she was laying on an air mattress and touched her vagina by rubbing it in a circular motion. In December 2023, the respondent started kissing A.M.'s arm while she was in bed and said you're my princess. These incidents made A.M. feel uncomfortable. On or about January 31, 2023, A.M. disclosed to her school's social worker that she is scared of the respondent, that she goes to her Aunt's house after school to avoid being alone with the respondent because she feels uncomfortable after he touched her vagina and kissed her arm. Based on the respondent's conduct, M.R. is derivatively abused. The respondent neglected the subject children by failing to provide them with proper supervision or guardianship by allowing to be inflicted harm, or a substantial risk thereof, on the subject children in that the respondent sexually abused A.M. and thus, M.R. is derivatively neglected.
A fact-finding hearing commenced on September 12, 2024, continued on November 20, 2024 and concluded on February 27, 2025. At the fact-finding, the petitioner introduced into evidence the certified Criminal Court records, which include a Criminal Court order of protection and the Criminal Court Complaint, and the Child Advocacy Center ("CAC") video interview conducted of the subject child A.M., and offered the testimony of the subject child A.M. and the non-respondent mother. At the conclusion of ACS's direct case, the respondent moved to dismiss the petition, asserting that the petitioner did not meet its prima facie burden of proving the allegations in the petition by a preponderance of the evidence. The Court denied the motion, finding that, in viewing the evidence in the light most favorable to the petitioner, the petitioner proved, by a fair preponderance of the evidence, that the respondent abused and neglected the subject child A.M., as defined in article 10 of the FCA, and that therefore, M.R. was derivatively abused and neglected. At the continuation of the fact-finding, the respondent declined to testify or offer any evidence to refute ACS's prima facie case and the fact-finding concluded.
The FCA defines a "respondent" in a child protective proceeding as "any parent or other person legally responsible for a child's care who is alleged to have abused or neglected such child" (Family Court Act § 1012[a]). Pursuant to FCA § 1012(g), a "person legally responsible"
"includes the child's custodian, guardian, or any other person responsible for the child's care at the relevant time. Custodian may include any person continually or at regular intervals found in the same household as the child when the conduct of such person causes or contributes to the abuse or neglect of the child."
"The common thread running through the various categories of persons legally responsible for a child's care is that these persons serve as the functional equivalent of parents" (Matter of Yolanda D., 88 NY2d 790, 795 [1996]). "Determining whether a particular person has acted as the functional equivalent of a parent is a discretionary, fact-intensive inquiry which will vary according to the particular circumstances of each case" (Matter of Yolanda D., 88 NY2d at 796).
"Factors such as the frequency and nature of the contact between the child and respondent, the nature and extent of the control exercised by the respondent over the child's environment, the duration of the respondent's contact with the child, and the respondent's relationship to the child's parent(s) are some of the variables which should [*3]be considered and weighed by a court in determining whether a respondent fits within the catch-all category of section 1012(g)" (Matter of Yolanda D., 88 NY2d at 796). Pursuant to FCA § 1012(e)(iii)(A), a child is abused when their parent or other person legally responsible for their care "commits, or allows to be committed an offense against such child defined in article one hundred thirty of the penal law." Pursuant to Penal Law § 130.52, "a person is guilty of forcible touching when such person intentionally, and for no legitimate purpose . . . forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire . . . [and] includes squeezing, grabbing or pinching." "[W]hen done with the relevant mens rea, any bodily contact involving the application of some level of pressure to the victim's sexual or intimate parts qualifies as a forcible touch within the meaning of Penal Law § 130.52" (People v Guaman, 22 NY3d 678, 684 [2014]).
Pursuant to Penal Law § 130.55, "[a] person is guilty of sexual abuse in the third degree when he or she subjects another person to sexual contact without the latter's consent." Pursuant to Penal Law § 130.60, "[a] person is guilty of sexual abuse in the second degree when he or she subjects another person to sexual contact and when such other person is . . . [l]ess than fourteen years old." The Penal Law defines "sexual contact" as "any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party" and "includes the . . . touching of the victim by the actor, whether directly or through clothing . . . ." (Penal Law § 130.00[3]). The intent to receive "sexual gratification may be inferred from the totality of the circumstances" (In re Jani Father B., 104 AD3d 508, 509 [1st Dept 2013]). Pursuant to Penal Law § 130.05(1), "it is an element of every offense defined in this article that the sexual act was committed without consent of the victim." Further, pursuant to Penal Law §§ 130.05(2)(b) and 130.05(3)(a), "[l]ack of consent results from incapacity to consent," and "[a] person is deemed incapable of consent when he or she is less than seventeen years old."
Pursuant to FCA § 1012(f)(i)(B), a subject child is neglected when his or her,
"physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof."
Moreover, to prevail at a fact-finding in a proceeding filed pursuant to article 10 of the FCA, the petitioner must prove that a subject child has been abused or neglected by a preponderance of the evidence (see Family Court Act § 1046[b][i]). Additionally, pursuant to FCA § 1046(a)(i), "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the legal responsibility of, the respondent." Further, as a respondent's "sexual abuse of [a] child demonstrate[s] a fundamental defect in understanding of his parental obligations," a finding of sexual abuse "support[s] a derivative abuse finding of the younger child" (Matter of M.R., 233 AD3d 454, 455 [1st Dept 2024]).
The petitioner has proven, by a fair preponderance of the evidence, that the respondent abused and neglected the subject children, as defined in article 10 of the FCA, by committing an offense against A.M. as defined in article 130 of the Penal Law and thereby derivatively abusing M.R., and by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, on A.M. and thereby derivatively neglecting M.R. The Court credits the testimony of the subject child A.M., who credibly testified as follows. A.M. currently lives with the non-[*4]respondent mother and her brother M.R., who is two years old. Prior to January 24, 2022, A.M. lived in the Dominican Republic with the non-respondent mother, which is where she first met the respondent as he used to come to the Dominican Republic to visit them. On January 24, 2022, when A.M. was 10 years old, she came to New York to reside with the respondent and the non-respondent mother in the respondent's home and they lived together for two years. When A.M. first began living with the respondent, their relationship was good. They would go out as a family to the park and to restaurants, the respondent bought A.M. clothing, shoes and toys and A.M. called the respondent "papi."
A.M. further credibly testified as follows. In March 2022, A.M. was living with the respondent, the non-respondent mother and M.R. A.M. slept in her own bed and the respondent, the non-respondent mother and M.R. slept in a separate bed. The two beds were in the same room. In March 2022, when A.M. was sleeping during the night, she fell out of her bed. When she awoke, she felt the respondent touch her on her vagina. She was wearing her pajamas, which consisted of long pants and a long sleeve top. A.M. felt the respondent touch her vagina with his hand, on top of her clothing. A.M. testified that with his hand, the respondent was caressing her vagina and that she did not like it and thought it was strange. While the respondent touched A.M.'s vagina, the non-respondent mother and M.R. were asleep in the other bed in the same room. After the respondent touched A.M.'s vagina, he left the room and eventually came back into the room and laid down in his bed. A.M. then went back to sleep. In the morning after the incident, A.M. told the non-respondent mother what the respondent had done, specifically, that the respondent touched her vagina and A.M. showed the non-respondent mother how he touched her vagina by demonstrating with her hands.
A.M. further credibly testified as follows. In January 2024, A.M. still shared a bedroom with the respondent, the non-respondent mother and M.R. The non-respondent mother bought a bunk bed for their bedroom and A.M. slept in the top bunk. One morning in January 2024, before the respondent went to work, he touched and kissed A.M.'s feet and hands and called her his "princess queen." A.M. moved her body so that the respondent would think she was going to get up and then he left the room. A.M. did not like when the respondent touched her as it made her feel uncomfortable. After that incident, A.M. told the non-respondent mother and her school counselor about what the respondent had done and she stopped speaking to the respondent and would try not to be in the same room as the respondent when they were home together.
The Court also credits the testimony of the non-respondent mother, who credibly testified as follows. The non-respondent mother has two children; A.M., who is 12 years old and M.R., who is two years old. The respondent is not A.M.'s biological father but he is M.R.'s biological father. The non-respondent mother began a romantic relationship with the respondent in 2012 when she was residing in the Dominican Republic and the respondent was residing in the United States. The respondent would visit her in the Dominican Republic and stay in her home. In 2018, when A.M. was six years old, the non-respondent mother and the respondent got married. In October 2021, the non-respondent mother came to New York to reside with the respondent. During this time, the respondent provided the non-respondent mother with financial and other support and the non-respondent mother did not have anyone else she could rely on in New York.
The non-respondent mother further credibly testified as follows. In January 2022, approximately two months after the non-respondent mother arrived in New York, A.M. traveled from the Dominican Republic to New York to reside with the non-respondent mother and the respondent in the respondent's home. When A.M. first arrived, everything was fine in that they [*5]got along as a family and the respondent was very involved in their lives. A.M. called the respondent "papi" and the respondent loved A.M. a lot. They did not leave the apartment often because it was cold, but when they did leave, they would go shopping for clothes, to restaurants and to the park.
The non-respondent mother further credibly testified as follows. One morning in March 2022, the non-respondent mother saw A.M. standing in front of the non-respondent mother's bed and she looked pale. When the non-respondent mother asked A.M. what was wrong, A.M. said "Daddy touched me," pointed to her vagina and showed the non-respondent mother with her hands how the respondent rubbed her vagina. When the non-respondent mother asked A.M. if she was sure the respondent touched her in that manner, A.M. stated "yes." The non-respondent mother believed A.M. when she told her what the respondent had done because A.M. is not the kind of child who lies. The non-respondent mother testified that there were occasions, after she had just given birth to M.R., when she woke up during the night and saw the respondent next to A.M. while A.M. was in her own bed, and that when the respondent noticed the non-respondent mother was awake, he would run out of the bedroom.
The non-respondent mother further credibly testified as follows. After the March 2022 incident, the non-respondent mother confronted the respondent about what A.M. had told her and the respondent said that the incident never happened. The non-respondent mother did not believe the respondent but she did not report anything to ACS or to the police because she did not have proof of what had occurred. After the incident, the non-respondent mother felt like there was no privacy in the home and she and A.M. were not comfortable there. The non-respondent mother told the respondent father that A.M. was afraid of him and that she wanted to leave New York and go home to the Dominican Republic. The respondent did not want to return to the Dominican Republic and he refused to give the non-respondent mother M.R.'s passport so she could not travel back to the Dominican Republic.
The non-respondent mother further credibly testified as follows. In or around December 2023, A.M. told the non-respondent mother that she felt uncomfortable because the respondent caressed her arms and legs. When the non-respondent mother asked A.M. if he touched her like a father, A.M. said no, not like a father, and stated that she felt uncomfortable in his presence. By January 2024, the non-respondent mother and the respondent were still married but were having relationship problems due to the incidents reported by A.M. and during that month, the respondent moved out of the bedroom in which they were all sleeping.
Based on the uncontroverted evidence presented at the fact-finding hearing, the Court finds that the petitioner has established, by a fair preponderance of the evidence, that the respondent abused the subject children, as defined in article 10 of the FCA, in that the respondent committed offenses against A.M. defined in Penal Law article 130 and that based on such conduct, M.R. is derivatively abused. As an initial matter, the petitioner established that the respondent is a person legally responsible for A.M.'s care under the FCA. A.M. credibly testified that she resided with the respondent in the respondent's home when the respondent touched her vagina, that the respondent provided for her financially and that she called him "papi." Additionally, the non-respondent mother credibly testified that she and the respondent have been married since 2018, that prior to her move to the United States to live with the respondent, the respondent would visit the non-respondent mother in the Dominican Republic and routinely stayed with her and A.M. in the non-respondent mother's home, that they were residing in the respondent's home when the respondent touched A.M.'s vagina, that the respondent provided for [*6]her and A.M. financially and that A.M. called the respondent "papi."
Additionally, the petitioner established, by a preponderance of the evidence, that the respondent committed the offense of forcible touching under Penal Law § 130.52 through A.M.'s credible testimony that the respondent intentionally touched her vagina over her pajama pants in the middle of the night and through the non-respondent mother's testimony that A.M. told her the respondent touched her vagina and demonstrated how he did it by using her hands to reflect a rubbing motion. Petitioner also established that the respondent's forcible touching of A.M. was done for the purpose of gratifying the respondent's sexual desire as sexual gratification can be inferred from the totality of the circumstances, including that the respondent touched A.M.'s vagina over her pajamas in the middle of the night, and the respondent failed to testify and offer any other explanation for his actions.
The petitioner also established, by a preponderance of the evidence, that the respondent committed the offense of sexual abuse in the third degree under Penal Law § 130.55 through A.M.'s credible testimony that the respondent touched her vagina over her pajama pants and that such conduct occurred without A.M.'s consent as she was incapable of consenting to the respondent's conduct because she was less than seventeen years old (see Penal Law §§ 130.05[2][b] and 130.05[3][a]). The petitioner also established that the respondent committed the offense of sexual abuse in the second degree under Penal Law § 130.60 through A.M.'s credible testimony that the respondent touched her vagina over her pajama pants and that she was less than fourteen years old when that occurred. Petitioner also established that the respondent sexually abused A.M. for the purpose of gratifying the respondent's sexual desire as sexual gratification can be inferred from the totality of the circumstances, including that the respondent touched A.M.'s vagina over her pajamas in the middle of the night, and the respondent failed to testify and offer any other explanation for his actions.
The petitioner also established, by a fair preponderance of the evidence, that the respondent neglected the subject children, as defined in article 10 of the FCA, in that he inflicted harm against A.M. which resulted in her mental and emotional impairment. Specifically, A.M. credibly testified that the respondent touched her vagina over her pajamas while she was sleeping in her own bed, that he did this without her consent and when she was 10 years old, and that it made her feel scared and uncomfortable. Additionally, based on this Court's finding that the respondent abused and neglected A.M., as defined in article 10 of the FCA, the petitioner also established, by a preponderance of the evidence, that M.R. was derivatively abused and derivatively neglected by the respondent.
Finally, the Court draws a strong negative inference from the respondent's failure to testify at the fact-finding. Contrary to the respondent's assertion, "[t]he criminal case pending against him at the time of the hearing did not deprive the court of the right to draw on adverse inference from his failure to testify" (Matter of Markeith G. (Deon W.), 152 AD3d 424, 425 [1st Dept 2017]).
For the foregoing reasons, the Court enters findings of abuse and neglect, as defined in article 10 of the FCA, against the respondent on behalf of the subject children A.M. and M.R..
This constitutes the decision and Order of the Court.
Dated: March 19, 2025
New York, NY
ENTER:
Hon. Yael Wilkofsky, JFC